UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


MARIA FERGUSON, ET AL.    )
                                  )
v.                             )          NO. 2:03-CV-360
                                  )
UNICOI COUNTY, ET AL.     )


## MEMORANDUM OPINION


The plaintiffs filed this complaint alleging violations of 42 *U.S.C.* §§ 1983 and 1985. In addition, the plaintiffs allege state causes of action for outrageous conduct, civil assault and battery, trespass, negligence, invasion of privacy, retaliation, fraudulent misrepresentation, suppression, false imprisonment, and violation of the Tennessee Constitution.

This complaint arises out of the search of Maria Ferguson's vehicle and the search of her home on September 10, 2003. In their amended complaint, the plaintiffs allege:

> 5.    On or about September 10, 2003, plaintiffs suffered personal injury and other harm when police officers from two independent East Tennessee law enforcement agencies, in conspiracy, illegally searched and seized Plaintiff Maria Ferguson's person, automobile and home, physically seizing, assaulting and battering other Plaintiffs, including five minor children

(ages 4 months, 4 y.o., 6 y.o. & 14 y.o.), in the process.

The plaintiffs are as follows:

1.  Maria Ferguson, individually, and as guardian for the Ferguson children, ages 14, 6 and 14 months.

2.  Anita Price

3.  Lupe Chandler

4.  Jeff Chandler, individually, and as guardian for the Chandler children, ages 6 and 4.

The defendants are as follows:

1.  Unicoi County, Tennessee

2.  Unicoi County Sheriff's Department

3.  Town of Erwin, Tennessee

4.  David K. Harris, in his individual and official capacity

5.  Michael Hensley, in his individual and official capacity

6.  Darren Bailey, in his individual and official capacity

7.  James White, Jr., in his individual and official capacity

8.  John Doe, unknown police officer at the scene

9.  Joe Crumley,  in his individual and official capacity

After careful consideration of the record as a whole, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

On the evening of September 10, 2003, Erwin Police Officers James White and Darren Bailey went in separate vehicles to a residence at 549 Monroe Street in Erwin, Tennessee based upon a report by the wife of a Town of Erwin police officer that Alfonso Garcia was seen at the residence. This residence was rented by Maria Ferguson and occupied by Ferguson and her three children. There were outstanding arrest warrants for Mr. Garcia and officers had been on the lookout for him earlier in the day.

As they arrived at the residence, Officer Bailey observed a bluish Toyota pulling out of the driveway, heading away from the house. Bailey immediately fell in behind the vehicle in order to observe the occupants in the vehicle, but was unable to do so because the rear window was blocked. Bailey had been advised that Garcia was at the house from which the vehicle had just left. Bailey had reason to believe that Garcia might be escaping in the bluish Toyota vehicle that had pulled out of the driveway.

Accordingly, Bailey initiated his lights and instituted a stop of the vehicle on Adams Street, during which time his traffic video camera was recording the stop.

3

Bailey approached the vehicle from the driver's side and told the female driver, Maria Ferguson, that there was an outstanding warrant for Alfonso Garcia and he had reason to believe that Garcia might have been in the house she had just left and needed to verify that he was not in her vehicle. After looking through the front passenger window, and shining his flashlight in the back seat, Baiey determined that Ferguson was the only occupant. He thanked her and returned to his patrol car.

Bailey did not ask for identification, registration or insurance information from Ferguson, nor did Bailey ask her to exit the vehicle, or disclose any contents of the vehicle. No search was conducted of any part of the vehicle. Bailey merely looked through the window and determined that the driver was the only occupant. The stop took no more than a couple of minutes as verified by Exhibit A attached to the Affidavit of James Darren Bailey.

After the traffic stop, Officer White went to the Monroe Street residence and knocked on the side door. The door was answered by Anita Price, a visitor at the residence and the sister of Maria Ferguson. White explained the situation and asked for permission to search for Garcia, but Ms. Price refused to allow entrance. In his affidavit, White states that Ms. Price appeared agitated, and the children in the residence appeared to be huddled together instead of playing normally. Both of these facts suggested the possible presence of an intruder in the residence. Officer Bailey

4

arrived at the residence a few moments later. At that time, White and Bailey were advised by dispatch that the informant had reported Garcia leaving the residence in a purple car. The officers advised dispatch that the only vehicles spotted leaving the residence had been checked revealing no sign of Garcia. Thereafter, they were advised that Garcia was probably still in the house.

Based upon these events, White and Bailey requested Unicoi County Sheriff Harris' presence at the scene. While waiting for the Sheriff, Bailey and White took positions to allow them to try to observe all sides of the residence. Thereafter, Sheriff Harris arrived at the scene along with Captain Michael Hensley of the Unicoi County Sheriff's Department, and White advised them of the circumstances.

Sheriff Harris proceeded to knock on the door of the house. He identified himself and his purpose to search the residence for Alfonzo Garcia. Harris' request was likewise refused. After unsuccessfully attempting to contact an Assistant District Attorney, Sheriff Harris contacted District Attorney General Joe Crumley by telephone regarding the situation. Sheriff Harris discussed the circumstances with Crumley and advised him as follows: (1) an individual with a felony warrant or warrants was believed to be in the home of a third party based upon information from a reliable informant; (2) that the individual was violent based upon the nature of the warrant(s), i.e. assault charges; (3) that the people in the home were acting in a

suspicious manner that indicated fear; (4) that there were children in the house; and (5) that consent to search had been requested but entrance was refused. Based upon the information given to him by the Sheriff, District Attorney General Crumley believed that exigent circumstances existed and advised Sheriff Harris to enter the residence and make the arrest, but to limit the search for the suspect to areas where the individual could be found (i.e. not to open drawers, etc.).

After his conversation with the District Attorney General, the Sheriff advised White that the officers could enter the residence to search for Garcia without a search warrant but that the search would be limited to looking for Garcia and could only involve areas where he could be hiding. Sheriff Harris, Captain Hensley and White entered the residence. According to Anita Price, Captain Hensley pushed open the door that she was holding. Once inside, Sheriff Harris remained in the living room with Anita Price and the children while Hensley and White searched the house. Garcia was not located during that search. The search of the house was conducted quickly and was limited to the areas of the house that could conceal a person. The testimony of the officers on the scene is that Officer Bailey did not enter the residence.

In her deposition, Maria Ferguson testified as follows:

Q.    Now, would you describe your actions that night as calming and trying to be the peacemaker or were you upset and screaming?

6

A.    I was upset.

Q.    And screaming?

A.    Yes.

Q.    Would you agree with me that if your children saw you upset and screaming that that would make them upset, too?

A.    They were upset because, I mean, when we were - - when I was talking to Sheriff Harris, I wasn't yelling or anything, but then when Mr. Hensley started yelling at me is when they started getting scared.

Q.    But you would agree with me, would you not, that if you had been calmer and nicer then there would-n't – you all wouldn't have had to engage in this dialogue where everybody's raising their voices at each other?

A.    I was calm in the beginning when I was talking to Officer Harris.  Just because I was yelling – we were yelling, you know, at each other at the end – but when I was talking to the sheriff, I was calm. It was just when Hensley and I – he started yelling at me so I started yelling back at him and I told him to let's step outside because I don't want to start yelling in front of my children.  And then we went outside and he started yelling and pointing his finger at me to shut up. (emphasis added)

Maria Ferguson further testified in her deposition as follows:

7

Q.   Okay.  And you say continuing in that paragraph that "Defendants physically assaulted and battered plaintiffs."  No one physically assaulted you, did they?

A.   No.
A.   Not that I know of.

Q.   Do you know if Denver Price ever filed a lawsuit against the police?

A.   Not that I know of.

Q.   Is he the only person that you know of that's ever been, as you say, harassed?

A.   That I know of.

She also testified that:

Q.   Have you ever even heard of him before, the District Attorney General for the First Judicial District?

A.   Not before I came back to Erwin.

Q.   Well, since you've returned do you know of the reputation of that office?

A.   No, not really.

Q.   So you have no reason to believe that that office in any way targets Latinos or Hispanics, do you?

A.   I don't know anything about General Crumley at all.

Q.   Or his office?

8

A.    Right.

Q.    And by "his office" I mean the office of the Attorney – District Attorney General.

A.    Yes.

Q.    You have no reason to believe that that office actually targets Latinos or Hispanics?

A.    I do not.

Ferguson went on to testify:

Q.    In your complaint you state that General Crumley conspired using deceit and misrepresentation – that he conspired with defendants Harris, Hensley, and Bailey to attempt to forcibly enter the private home, et cetera, et cetera. What is the basis for your contention that General Crumley conspired with anybody regarding the events of September 10th, 2003?

      MR. TORRES:    I object as to the form.

BY MS. ROSS:

Q.    Do you have any basis at all for thinking that General Crumley conspired with anybody?

A.    I don't know. I don't know.

Q.    So you answer is no, you don't know –

A.    I don't know.

Q.    – Of any basis?

9

A.    I don't know any.

At her deposition on August 24, 2004, Anita Price testifed as follows:

Q.    All right.  How did the – how was entrance to your house gained?

A.    They knocked on the door.  Kent Harris came the second time to the door and he knocked and I had went to the door and it was Kent Harris, Michael Hensley, and White.

Q.    Okay.  And they told you what?

A.    Open the door not all the way.  And I had my foot propped up behind it and my hand against the doorknob holding it.

Q.    Okay.

A.    And he – he asked me why I don't see the problem with searching the house.  I said, Well, let me see your search warrant.  And at that time Michael Henlsey shoved the door open with me holding it and said, Well, we don't have to have one.

Q.    Then what happened?

A.    The opened the door; they came in.  And Kent Harris told us to stay in the living room and to sit down, told us to stay right there.

Q.    And did you?

A.    We had no choice.  Yes.

Q.    Were you cooperative or were you screaming, yelling, and hollering?

A.    No, I was cooperative.

Q.    What were the children doing during this time?

A.    They sat down, looked a little shocked, especially with the officers having guns on them and everything else. I'd be a little shocked, too.

Q.    Okay. They had guns on them, but the guns weren't drawn; correct?

A.    Correct.

Q.    And then what did the officers do? If I understand right, Sheriff Harris stayed with you and the children in the living room. What did the other officers do?

A.    They went through the house.

Q.    How much time elapsed as they went through the house? Just a couple of minutes?

A.    Couple minutes.

She also testified during her deposition as follows:

Q.    Now, in your lawsuit you say that you had significant, substantial, and severe injuries. That's not true, is it?

A.    I had injuries. I mean, it's stressful.

Q.    Okay. Other than stressful, you didn't have any personal injuries.

A.    Not physical injuries.

11

Q.     All right.  So there was no assault and battery; correct?

MR.  UNDERWOOD:    Objection as to form.

BY MR.  PRINCE:

Q.     You weren't physically injured or physically struck, were you?

A.     The door pushed me open.

Q.     But that didn't cause you any injury, did it?

A.     Emotional injury – I mean emotional.

Q.     All right.  What type of emotional injury did you sustain?

A.     It bothered me that – what everything that happened for them to do something like that to me.

Although Maria Ferguson's 14 year old blind daughter is chronologically 14, she is developmentally age 4 or 5.   Prior to and during the search of the Ferguson home, this child remained in her bedroom.

CONCLUSIONS OF LAW

1.  **LUPE CHANDLER AND JEFF CHANDLER**

Neither of these plaintiffs was present during the search of Maria Ferguson's vehicle or the search of her residence.  Contrary to plaintiffs assertion, all blood relatives do not have standing to contest a search of a relative's home.

12

Therefore, the complaint of these plaintiffs as individual plaintiffs will be dismissed.

## 2.   SECTION 1981  AND  1985 CLAIMS

The plaintiffs have offered absolutely no evidence that a conspiracy existed in this case in their affidavits or depositions.  Accordingly, the plaintiffs' complaint in this regard will be dismissed.

## 3.  UNICOI COUNTY SHERIFF'S DEPARTMENT

The Unicoi County Sheriff's Department is not a suable legal entity and the plaintiff's complaint against this defendant will be dismissed.

## 4.  DISTRICT ATTORNEY  GENERAL JOE CRUMLEY

In this case, before entering Maria Ferguson's home, the officers called District Attorney  General Joe Crumley.   In regard to Crumley's  role in advising officers to enter the house to search for a fugitive who had an outstanding arrest warrant, the Court FINDS that his action is entitled to absolute immunity. The Supreme Court held in *Burns v. Reed,*  500 U.S. 478, 493 (1991),  that "advising the police in the investigative stage of a criminal case is [not] so intimately associated with the judicial phase of the criminal process that it qualifies for absolute immunity." Crumley, however, was not advising the officers in the investigative stage of the case. Rather, he was directing the officers to continue the search because  the arrest of the

fugitive was necessary to continue judicial proceedings. The Court FINDS, like the

preparation of an arrest warrant, this action was part of the prosecutor's "preparing for

the initiation of judicial proceedings." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273

(1993).

Therefore, Crumley's actions were protected by absolute immunity

because prosecutorial immunity will attach even to administrative or investigative acts

necessary for a prosecutor to initiate or maintain the criminal prosecution. See *Ireland

v. Tunis*, 113 F.3d 1435, 1446 (6th Cir. 1997). Accordingly, the plaintiffs' complaint

against District Attorney General Crumley will be dismissed.

### 4. <u>SEARCH AND SEIZURE OF MARIA FERGUSON'S VEHICLE</u>

The Fourth Amendment is not a guarantee against all searches and

seizures, but only against unreasonable searches and seizures. *United States v.

Sharpe*, 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). The authority

and limits of the Amendment apply to investigative stops of vehicles such as Maria

Ferguson's vehicle which occurred here. *United States v. Hensley*, 469 U.S. 221,

226, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985); *United States v. Cortez*, 449 U.S.

411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *Delaware v. Prouse*, 440 U.S.

648, 663, 99 S.Ct. 139, 1401, 59 L.Ed.2d 660 (1979); *United States v.

Brignoni-Ponce,* 422 U.S. 873, 878, 880, 95 S.Ct. 2574, 2578, 2579, 45 L.Ed.2d 607

(1975).

In her deposition, Maria Ferguson testified that during the investigatory stop of her vehicle on September 10, 2003, the officer did not ask for her driver's license, he did not ask her to get out of the car, he did not ask for her registration, he did not ask her to open the trunk, and he did not ask her to open the glove compartment.    He did ask her if she knew Alfonso Garcia, and he shined a flashlight into the back of her vehicle.  She admitted that, at the most, the stop lasted about two (2) minutes.

In *Bennett v. City of Eastpointe* 410 F.3d 810, 826-827 (6th Cir. 2005), the Sixth Circuit addressed an investigatory stop in the context of a Section 1983 action:

> In *United States v. Sharpe*, the Supreme Court emphasized, as it had explained in Place, that "in assessing the effect of the length of the detention, we take into account whether the police diligently pursued their investigation." 470 U.S. at 685, 105 S.Ct. 1568 (quoting *Place*, 462 U.S. at 709, 103 S.Ct. 2637). Thus, it is "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant" or his property. *Sharpe*, 470 U.S. at 686, 105 S.Ct. 1568. More-over, "the brevity of the invasion of the individual's Fourth Amendment interests" is key in determining whether a seizure can be justified on reasonable suspicion. *Sharpe*, 470 U.S. at 685, 105 S.Ct. 1568 (citations omitted and emphasis added). The brevity or length of the detention is a flexible concept and needs to be evaluated in light of the

15

law enforcement needs "as well as the time reasonably needed to effecuate those purposes." *Id*.

In *Sharpe*, supra at 683, the Supreme Court concluded that it was reasonable under the circumstances for the agent to detain an individual, whose vehicle contained challenged evidence, for approximately 20 minutes, and that the detention of that individual clearly met the Fourth Amendment's standard of reasonableness.

In this case, the Court FINDS that the police officer diligently pursued a means of investigation that was likely to confirm or dispel his suspicions quickly, during which time it was necessary to detain the plaintiff briefly. The two minutes that Ms. Ferguson was detained was a time reasonably needed to effecuate those purposes, there was no a lack of diligence on the part of the officer sufficient to violate the Fourth Amendment, and Ferguson's detention clearly met the Fourth Amendment's standard of reasonableness. Therefore, there is no constitutional violation in regard to the investigatory stop of Maria Ferguson's vehicle and her complaint in this regard will be dismissed.

Although all of the other plaintiffs allege that they suffered personal injury and other harm when Maria Ferguson's vehicle was searched, it is undisputed that Maria Ferguson was the only plaintiff present during the investigatory stop.

16

However, to the extent any of the other defendants have standing,[1] any claim in regard to the investigatory stop of Maria Ferguson's vehicle filed by Anita Price and the five minor children will be dismissed, for the same reasons.

## 5. <u>WARRANTLESS ENTRY OF MARIA FERGUSON'S HOME</u>

The Sixth Circuit has addressed the issue of standing to object to a search in the context of a Section 1983 action, and concluded:

> To assert a Fourth Amendment violation, Shamaeizadeh must show that the government's action in some way invaded his own reasonable expectation of privacy. *United States v. Knotts*, 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983); *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). We apply a two-part test to determine whether Shamaeizadeh had a reasonable expectation of privacy, asking (1) whether Shamaeizadeh "manifest[ed] a subjective expectation of privacy in the premises searched"; and (2) whether society is "prepared to recognize that expectation as legitimate." *Bonds v. Cox*, 20 F.3d 697, 701 (6th Cir.1994).

*Shamaeizadeh v. Cunigan*, 338 F. 3d 535, 544 (6th Cir. 2003).

In deciding whether someone has a reasonable expectation of privacy for Fourth Amendment purposes, courts consider a number of factors, including the person's proprietary or possessory interest in the place to be searched or item to be seized ....; whether the defendant has the right to exclude others from the

---

[1]    None of the other plaintiffs appear to have any standing to pursue any claims related to the investigatory stop of Maria Ferguson's vehicle and they have failed to put forth any reasonable argument that they do.

17

place quirestion; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises. *United States v. King*, 227 F.3d 732, 744 (6th Cir.2000); *See Hardwig v. United States*, 23 F.2d 922, 922 (6th Cir.1928) (concluding that a lessee who sublets part of a building to a sublessee personally has "no right to object to evidence of what was found or done there"). *See* also *Shamaeizadeh* at 544-545.

In regard to Anita Price, this plaintiff has expressly acknowledged that she had no authority to consent to a search of Maria Ferguson's home. She was only present to babysit the minor children in the home and she had no proprietary or possessory interest in Maria Ferguson's home. She had no right to exclude others from the place in question, there is no evidence that she had taken normal precautions to maintain her privacy, and there is no evidence that she had exhibited a subjective expectation that the area would remain free from governmental intrusion. Therefore, Anita Price had no standing to contest the search of Maria Ferguson's home and her complaint in regard to this search will be dismissed.

It is undisputed that the Chandler children, who were 4 and 6, were temporarily in Maria Ferguson's home while their parents went out to eat. These children had no proprietary or possessory interest in Maria Ferguson's home, they

had no right to exclude others from the place in question, there is no evidence that they had taken normal precautions to maintain their privacy; and there is no evidence that they had exhibited a subjective expectation that the area would remain free from governmental intrusion. Therefore, the Chandler children have no standing to contest the search of Maria Ferguson's home and their complaint in regard to the search will also be dismissed.

## 6. EXIGENT CIRCUMSTANCES FOR THE SEARCH

Turning to the warrantless entry claim in regard to Maria Ferguson and her three minor children, the Court FINDS that exigent circumstances existed to justify a warrantless entry. In *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6TH Cir. 2002), the Sixth Circuit has explained:

> A police officer's entry into a home without a warrant is presumptively unconstitutional under the Fourth Amendment. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir.1994). Warrantless entries are permitted, however, where "exigent circumstances" exist. *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir.1992). Exigent circumstances exist where there are " 'real immediate and serious consequences' that would certainly occur were a police officer to 'postpone[ ] action to get a warrant.' " *O'Brien*, 23 F.3d at 997 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)). The relevant inquiry is whether the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed. *Dickerson*, 101 F.3d at 1158. Three types of circumstances have traditionally been found to

constitute exigent circumstances: "(1) when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers and public; (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals."

The importance of the potential danger to innocent people in the house is apparent from the Sixth Circuit's opinion in *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996), which held that even the articulation of the exception requires only a "justified belief" and does not require knowledge or certainty of the presence of someone in danger. In finding that exigent circumstances existed as a matter of law in *Dickerson,* the Sixth Circuit emphasized that the reasonable belief that a hostage could be present in the house-- even though this turned out to not be the case– would suffice. *Id.* at 1160.

The Court FINDS that the suspect in this case represented a potential immediate threat to those plaintiffs who were present in Maria Fergusons's home, that immediate police action was necessary to thwart the escape of this known criminal, and that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed. The officers had reliable information that Garcia was present in Ferguson's home, that he was a violent person, that the occupants of the house were acting in a manner

20

consistent with fear on their part, reasonably suggesting to the officers that an intruder might be present in the house, and that children were present.

Accordingly, the complaint of Maria Ferguson and her three children in regard to the warrantless entry of their home will be dismissed.

### 7.   SEIZURE OF THE PLAINTIFFS DURING THE SEARCH

A Fourth Amendment seizure occurs when a police officer restrains the liberty of a citizen in such a way that a reasonable citizen would reasonably believe under the circumstances that he or she was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). A violation of the Fourth Amendment requires the "intentional acquisition of physical control" of a person by a state official. *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).

Maria Ferguson testified during her deposition that when she arrived home during the search of her home, she asked Captain Hensley to step outside to talk to her and he did. It is also undisputed that Maria Ferguson's 14 year old daughter was in her room prior to the search, and there was no evidence that she was moved or asked to move during the search.

The fact that officers exercised control over the environment in the Ferguson home does  not demonstrate that Mrs. Ferguson or her 14 year old daughter were

seized. The distinguishing feature of a seizure is the restraint of a person's liberty, that is, her freedom to walk away. Control over a plaintiff's environment does not establish a seizure unless that control somehow restricts a plaintiff's physical liberty. There are no facts alleged in this case that would suggest that the physical liberty of Maria Ferguson or her 14 year old daughter was restricted. See *Ewolski*, 287 F.3d at 507. Therefore, their cause of action based upon an illegal seizure will be dismissed.

In regard to the alleged seizure of Anita Price and the other four minor children, it is undisputed that they were restricted to the living room while the search, which lasted a "couple of minutes", was conducted. In determining whether a Fourth Amendment violation has occurred, it is necessary to balance the governmental interest in the temporary seizure against the individual's interest in avoiding the intrusion. See *Bennett*, 410 F.3d at 826. As previously noted in regard to the search of Maria Ferguson's vehicle, in assessing the effect of the length of the detention, this Court must take into account whether the police diligently pursued their investigation.

In this case, the Court FINDS that the temporary detention of Anita Price and the other four minor children for a couple of minutes during the search of the Ferguson home was justified to protect these four plaintiffs from any danger that could have arisen if a fugitive was found and arrested in the Ferguson home.

22

Therefore, their detention clearly met the Fourth Amendment's standard of reasonable-ness, and there was no constitutional violation in regard to the seizure of these plaintiffs during the search of the Ferguson home. The complaint of these plaintiffs in this regard will also be dismissed.

### 8. EXCESSIVE FORCE CLAIMS

Although the plaintiffs have alleged that they were physically seized, assaulted and battered, the testimony of Maria Ferguson and Anita Price establishes that, in fact, none of the minor plaintiffs nor Maria Ferguson was touched in any manner. For the reasons set out herein, because this Court has found that the detention of the four minor children clearly met the Fourth Amendment's standard of reasonableness, and that there was no constitutional violation in regard to the seizure of these plaintiffs during the search of the Ferguson home, the claims of excessive force of the four minor plaintiffs must also fail. The undisputed facts of this case show that one officer stayed in the living room while other officers did a walk through search of the house for a couple of minutes. Such conduct fails as a matter of law to allege any sort of police brutality which could result in severe mental anguish.

The only plaintiff who offered any proof evenly remotely related to an excessive force claim was Anita Price, who testified that the officers forced their way into the door of the home which caused her emotional injury but no physical injury.

When she was asked to describe her emotional injury, she merely stated that "it bothered me that – what everything that happened for them to do something like that to me." Although she may have been "bothered," she never sought any type of treatment. Although the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness, the Court FINDS that under the facts of this case, given the exigent circumstances that existed at the time, the force used by Officer Hensley to open the partially open door braced by Anita Price's foot, was not excessive under objective standards of reasonableness. See *Lyons v. City of Xenia*, 417 F.3d 565, 587 (6th Cir. 2005). Therefore, Anita Price's claim of excessive force must also be dismissed.

### 9. QUALIFIED IMMUNITY

Even if a constitutional violation had occurred, the Court FINDS that the officers are entitled to qualified immunity in this case. As stated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 206, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001):

> Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their

24

actions. The same analysis is applicable in excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable.

After finding that it was not clearly established, in a particularized sense, that an officer violated the Fourth Amendment's deadly-force standards by shooting a suspect as he fled in vehicle, given the risk posed to persons in the immediate area, the Supreme Court, *citing Saucier*, stated in the recent case of *Brosseau v. Haugen*, 125 S.Ct. 596, 599 (2004):

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. *Saucier v. Katz*, 533 U.S., at 206, 121 S.Ct. 2151 (qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force' "). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation. It is important to emphasize that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id., at 201, 121 S.Ct. 2151.   (Emphasis added)

Citing *Brosseau* and *Saucier*, the Sixth Circuit has also addressed the two-step process necessary to a qualified immunity analysis in *Lyons*, 417 F.3d at

571,

Brosseau reaffirms the two-step process announced in, and supplements the reasoning of, *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In addressing qualified-immunity claims, *Saucier* instructed lower courts initially to consider whether "the facts alleged show the officer's conduct violated a constitutional right." Id. at 201, 121 S.Ct. 2151. If the plaintiff can establish that a constitutional violation occurred, a court should ask <u>"whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition</u>." Id.   (Emphasis added)

The Sixth Circuit in *Lyons* concludes:

As *Brosseau* makes clear, "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." 125 S.Ct. at 599. "Because the focus is on whether the officer had fair notice that her conduct was unlawful," *Brosseau* explains, "reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." Id. <u>*Brosseau* leaves open two paths for showing that officers were on notice that they were violating a "clearly established" constitutional right</u>--where the violation was sufficiently "obvious" under the general standards of constitutional care that the plaintiff need not show "a body" of "materially similar" case law, id., and where the violation is shown by the failure to adhere to a "particularized" body of precedent that "squarely govern[s] the case here," id. at 599-600.

26

*Id.* at 578-579.

Based on the facts of this case, the Court FINDS that it was not sufficiently "obvious" under the general standards of constitutional care that exigent circumstances did not exist for the warrantless searches of Maria Ferguson's vehicle and home. Based upon the information that they had in regard to the fugitive, and based upon the advice of District Attorney General Crumley, the officers in this case had reasonable beliefs as to the facts establishing the existence of exigent circumstances. In this case, the plaintiffs have offered only broad general propositions that it was obvious that their rights were being violated.

The Court also FINDS that it would not have been obvious that a seizure, lasting a couple of minutes, of the occupant of the vehicle or the occupants of the house would have been constitutionally unreasonable under the circumstances here. In addition, the Court FINDS that the fact that an officer pushed open the partially open door of the home without causing any physical harm was not an obvious violation of the rights of Anita Price by the use of excessive force.

Although the plaintiffs assert that Crumley and the officers cannot be believed, credibility determinations are not appropriate in the determination of summary judgment. *Scott v. Clay County*, 205 F.3d 867, 871 (6th Cir.2000). It is also important to note that many of the factual assertions set out in the plaintiffs'

complaint and in plaintiffs' response to the defendants' motions for summary judgment are directly contradicted by the depositions of Maria Ferguson and Anita Price which were offered in support of plaintiffs' response.

Because the alleged violations were not sufficiently "obvious" under the general standards of constitutional care, the plaintiffs must show "a body" of "materially similar" case law, that is, where the violation is shown by the failure to adhere to a "particularized" body of precedent that "squarely govern[s] the case." *Brosseau*, 125 S.Ct. at 599-600. In this case, the plaintiffs have completely failed to cite any particularized, materially similar case law that squarely governs their case.

Therefore, because the Court FINDS that the plaintiffs in this case have not satisfied either requirement for showing the violation of a "clearly established" constitutional right, the defendant officers are entitled to qualified immunity.

## 10. CUSTOMS AND/OR POLICIES

The plaintiffs have also failed to show a custom or policy of Unicoi County or the Town of Erwin that enabled its agents and employees to act with deliberate indifference to the constitutional rights of individuals. The plaintiffs contend that to permit the District Attorney General or the Unicoi County Sheriff

to determine whether or not a warrant will be obtained instead of a detached neutral magistrate is a policy that violates their Fourteenth Amendment rights.   However, the plaintiffs cite no authority for the proposition that such a policy is impermissible.  Accordingly, the plaintiffs' complaint against Unicoi County and the Town of Erwin will be dismissed.

## 11. PENDENT JURISDICTION OF STATE LAW CLAIMS

The Sixth Circuit has recognized a general rule disfavoring a district court's exercise of pendent jurisdiction when federal issues are dismissed before trial. *Gaff v. FDIC*, 814 F.2d 311, 319 (6th Cir.1987). The Court finds that there is no reason presented in this case to warrant a departure from that general rule, and that based upon "judicial economy, convenience. fairness, and comity," that this Court should not exercise pendent jurisdiction of these claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Accordingly, the Court declines to exercise pendent jurisdiction of the plaintiff's state law claims, and the plaintiffs' state law claims will be  dismissed without  prejudice.

An appropriate order shall issue.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE